UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN S. SCHUPP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:10CV1903 TIA |
| | ) | |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Disability Insurance Benefits under Title II of the Act.

Claimant has filed a Brief in Support of his Complaint; the Commissioner has filed a Brief in

Support of his Answer; and Claimant has filed a Brief in Reply.  The parties consented to the

jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

To qualify for disability insurance benefits, Claimant is required to prove that he was

disabled prior to the expiration of his insured status.  42 U.S.C. §§ 416(I); Tilley v. Astrue, 580

F.3d 675, 676 (8th Cir. 2009).  Thus, the relevant period is from his alleged disability onset date,

September 30, 2006, until the date his insurance status expired, September 30, 2006.  Tilley, 580

F.3d at 676.

**I.     Procedural History**

On August 10, 2006, Claimant filed an Application for Disability Insurance Benefits under

Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 191-95)[1] alleging disability since September 30, 2006 due to bad back, heart problems, and high blood pressure.  (Tr. 213, 219).  The application was denied (Tr. ), and Claimant subsequently requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 46).  On October 1, 2009, a hearing was held before an ALJ.  (Tr. 30-56).  Claimant testified and was represented by counsel.  (Id. at 30-51).  Vocational Expert Gary Weimholt also testified at the hearing.  (Tr. 51-55, 189-90).  In a decision dated December 19, 2009, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act.  (Tr. 11-24).[2]  After considering the contentions raised by counsel and the additional medical evidence, the Appeals Council denied Claimant's Request for Review on August 30, 2010.  (Tr. 1-6, 267-69, 816-21).  Thus, the ALJ's decision is the final decision of the Commissioner.

## II.    Evidence Before the ALJ

### A.  Hearing on October 1, 2009

#### 1.  Claimant's Testimony

At the hearing on October 1, 2009, Claimant testified in response to questions posed by

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer. (Docket No. 13/filed December 20, 2010).

[2]On November 26, 2008, the Appeals Council remanded the previous ALJ's decision for further proceedings as follows:

the Appeals Council directed the [ALJ] to evaluate treating source information received at the Appeals Council level, evaluate the State agency medical opinion, and formulate a residual functional capacity during the period at issue referring to the evidence that supports the residual functional capacity and obtain information from a vocational expert regarding the claimant's transferrable skills and identify any conflict among that testimony and the information contained in the Dictionary of Occupational Titles and its companion publication the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 14, 116-18).

the ALJ and counsel. (Tr. 33-56). Claimant's date of birth is June 23, 1953. (Tr. 35). Claimant has been married for twenty three years and has three children living at home. (Tr. 36). Claimant's wife became disabled after injuring her back while working as a paramedic. His wife receives social security disability benefits. (Tr. 36). Claimant is covered by Medicaid. (Tr. 37). Claimant has a bachelor's degree in biology and thereafter completed nursing school at Deaconess Hospital School of Nursing in 1978. (Tr. 37-38). Claimant became a licensed registered nurse. (Tr. 38). Claimant stands at five feet eight inches and weighs approximately 276 pounds. (Tr. 40).

Claimant testified that he last worked as a RN in 2001. (Tr. 38). Claimant stopped working in part his back was bothering him, and his job required a lot of lifting. (Tr. 38). Claimant also stopped working to care for his mother and to overlook her care. (Tr. 39, 64). Claimant started taking care of his mom, an invalid, full-time by washing her clothes, making simple meals, and assisting her to the bathroom twenty-four hours a day until her death in March 2004. (Tr. 39, 64-65). Claimant testified that he did not return to nursing because of his back and heart conditions. (Tr. 39).

Dr. Remo started treating Claimant in 1998 and has treated him on thirty-six occasions. (Tr. 40). Claimant has a cane he uses every time he goes outside, and sometimes when he is inside the house. (Tr. 43). Claimant started using the cane in 2005/2006. (Tr. 43). Claimant testified that he had not been prescribed to use the cane. (Tr. 44). Claimant testified that his heart condition started affecting his ability to exert himself in 2002/2003. (Tr. 45). Claimant had a stent inserted in 2005 and a couple of cardiac caths. (Tr. 45-46). Claimant testified that his activity at home has decreased over the years. (Tr. 46).

- 3 -

Claimant goes to the grocery store with his wife once or twice a week.  (Tr. 47).
Claimant rides in the electric cart if one is available.  (Tr. 48).  His youngest daughter does the
major cleaning.  (Tr. 48).  Claimant testified he has difficulty sitting and standing for long periods
of time.  (Tr. 49).  Claimant testified that he needs to lie down with pillows under his legs every
day.  (Tr. 49).

Claimant drove to the hearing and has a valid driver's license.  (Tr. 40).

### 2. Testimony of Vocational Expert

Vocational Expert Gary Weimholt, a vocational rehabilitation consultant, testified in
response to the ALJ's questions.  (Tr. 51-55; 189-90).  Mr. Weimholt described Claimant's past
work to be a general duty nurse, a skilled job at a medium exertional level per the DOT with a
SVP of seven.  (Tr. 52).  Mr. Weimholt described the secondary school teacher job to be a light
exertional job.  (Tr. 53).  With respect to transferable skills to the sedentary exertional level, Mr.
Weimholt opined the most transferable skills would be in the area of medical services as a nurse
consultant, and there are 2500 positions in Missouri.  (Tr. 53-54).  Mr. Weimholt further noted
there are other lesser jobs such as medical secretaries, appointment clerks, medical record keeping
, hospital admitting clerk, and medical technology would be transferable.  (Tr. 54).

The ALJ asked Mr. Weimholt "if an individual with the education, age, and work
experience of the claimant could not sustain eight-hour workdays on an ongoing basis, what affect
would that have on the ability to transfer skills?"  (Tr. 55).  Mr. Weimholt that such jobs require
that ability to maintain regular attendance in employment, to make good use of your time when
you are at work, and to be able to work without making mistakes or having a lot of breaks.  Mr.
Weimholt concluded that the inability to sustain an eight-hour workday on a regular basis would

preclude performing the jobs outlined.

Claimant's counsel asked no questions of Mr. Weimholt at the hearing.  (Tr. 55).

### 2. Forms Completed by Claimant

In the Function Report - Adult, Claimant reported taking care of his children and with their help, cooking, cleaning, and doing the laundry and taking care of the dog.  (Tr. 229). Although not prescribed by a doctor, Claimant reported using a cane.  (Tr. 234).

## III.    Medical and Other Records

On August 31, 2001, Claimant underwent cardiac catheterization due to palpitations. (Tr. 276-77).

On May 21, 2002, Claimant returned to Dr. Remo for treatment after a long absence.  (Tr. 346).

On August 30,2002, Claimant returned for his three month visit to Dr. Remo requesting refills of all of his medications.  (Tr. 345).

On January 30, 2003, Claimant returned for treatment following his recent hospitalization for cellulitis involving his right heel and right middle index finger.  (Tr. 344).

In follow-up treatment for hypertension and depression on March 14, 2003, Claimant reported having been "exercising quite engaging in physical activities."  (Tr. 343).

On September 2, 2003, Claimant returned for follow-up of his hypertension, palpitations, and anxiety/depression.  (Tr. 342).  Claimant reported taking care of his mother who has dementia and requires total care.  Claimant reported being served a restraining order from his daughter after punishing her by using a ruler and leaving an erythematous area on her thigh.  Dr. Remo adjusted Claimant's medication regime.  (Tr. 342).

- 5 -

On January 21, 2004, Claimant received treatment for an infection of his right middle finger and right heel area after a fall while playing paint ball with his son. (Tr. 341). Dr. Remo treated Claimant's superficial skin infection by giving a tetanus injection and prescribing Reflex and Ciprofloxacin. (Tr. 341).

The June 4, 2004 x-ray of Claimant's lumbar spine showed mild degenerative change and minor scoliosis. (Tr. 398, 696).

Claimant started physical therapy treatment for his low back and left leg pain on June 15, 2004. (Tr. 391, 689). The physical therapist recommended treatment three times a week. (Tr. 393, 691). After two no call/no show appointments on July 6 and 8, 2004, the physical therapist terminated Claimant from treatment on July 29, 2004. (Tr. 396, 694).

On July 6, 2004, Claimant reported back pain after reinjury of his back while trying to help his mother. (Tr. 339). X-rays showed narrow disk spaces. Dr. Remo noted Claimant to be undergoing physical therapy. Dr. Remo ordered a MRI of his lumbar area and refilled his medications. (Tr. 339).

The July 8, 2004, MRI of Claimant's lumbar spine showed degenerative changes and small left posterolateral and foraminal disk herniation at L3-4. (Tr. 389, 574, 687).

During an office visit on August 20, 2004, Dr. Remo increased Claimant's Norco dosage as treatment of his degenerative joint disease of his back. (Tr. 338).

On January 5, 2005, Dr. John Groll performed a cardiac catheterization, angioplasty, and stenting of two heart vessels after being admitted with sharp chest pain in the chest region and an unstable angina. (Tr. 279, 545). In the discharge summary, Dr. Groll noted that Claimant could return to strenuous activities on January 10, 2004 with no lifting of anything more than ten

- 6 -

pounds until that date.  (Tr. 281).

On January 7, 2005, Claimant returned for follow-up treatment after recent hospitalization at Missouri Baptist Medical Center due to chest pain.  (Tr. 337).  Dr. Remo noted that a cardiac catheterization was done followed by stent placement.  Claimant reported no pain, feeling better, and being less agitated following the procedure.  Dr. Remo adjusted Claimant's medication regime.  (Tr. 337).

On February 4, 2005, Dr. Robert Cargile made a referral to the pain management center for treatment of Claimant's left lumbar radiculopathy.  (Tr. 572).

On March 4, 2005, Claimant reported generalized fatigue and persistent lower back pain. (Tr. 336).  Claimant reported seeing a neurosurgeon who recommended pain management with epidural steroid injection.  Dr. Remo referred Claimant to receive treatment from Dr. Dave at the pain clinic.  (Tr. 336).

Claimant returned on April 28, 2005, for follow-up treatment after middle finger laceration by a table saw.  (Tr. 334).  Dr. Remo noted Claimant's pain to be at a level five.  (Tr. 334).  Dr. Remo strongly advised Claimant to make an appointment with Dr. Dave noting unfortunately the appointment had not been scheduled as recommended.  (Tr. 334-35).  Dr. Remo refilled his medications.  (Tr. 335).

The August 26, 2005, radiology report of Claimant's lumbar spine showed degenerative disc disease, facet joint osteoarthritis, and hypomotility on flexion and extension.  (Tr. 321).  The radiology report of hip and pelvic region showed degenerative disc disease L2-3, L3-4, and L4-5, most significantly at L4-5, facet joint osteoarthritis at L4-5 and L5-S1, hypomotility on flexion and extension, and normal bilateral hips.  (Tr. 564).

The September 13, 2005, MRI of Claimant's lumbar spine showed mild degenerative disc disease at L2-3, L3-4, and L4-5 with no significant neural foraminal stenosis or central canal stenosis.  (Tr. 319,559).

On October 5, 2005, Claimant returned to the Sullivan Clinic requesting refills of his medications.  (Tr. 332).  Claimant reported being able to work around the garden but not being able to exert himself beyond that work.  Dr. Remo noted reviewing the MRI from Barnes showing degenerative disk disease with no significant neural foraminal stenosis or central canal stenosis.  (Tr. 332).  At Claimant's request, Dr. Remo refilled all of his medications.  (Tr. 333).

On February 3, 2006, Claimant returned to the Sullivan Clinic for a refill of his medications.  (Tr. 330, 483, 757).  Claimant reported having fatigue, anxiety, and stress from dealing with family matters.  Claimant has continued neck and back pains and going to see a pain specialist.  (Tr. 330, 483, 757).

On July 10, 2006, Claimant returned for a comprehensive examination after last being seen by Dr. Remo in February 2006.  (Tr. 480, 754).  Claimant reported low back pain with radiculopathy to both legs and taking Narco which helps him tolerate the pain.  (Tr. 480, 754).  Dr. Remo refilled his medications and referred him to neurosurgery at Barnes so that Claimant could follow through with his pain management consultation.  (Tr. 481, 755).

In a follow-up visit with Dr. Remo on October 13, 2006, Claimant requested a refill of his medications.  (Tr. 478, 752).

In the Physical Residual Functional Capacity Assessment completed on November 7, 2006, R. Stoecker, a medical consultant, listed Claimant's primary diagnosis to be DJD lumbar facets and his secondary diagnosis to be ischemic heart disease and hypertension.  (Tr. 410).  The

- 8 -

consultant indicated that Claimant can occasionally lift fifty pounds, frequently lift twenty-five

pounds, and stand and walk about six hours in an eight-hour workday.  (Tr. 411).  The consultant

noted that Claimant can sit about six hours in an eight-hour workday and has unlimited capacity

to push and/or pull other than shown.  As evidence in support, the consultant noted how Claimant

did not report back pain to his treating physician and made no request for treatment with pain

medication until September 2003.  The consultant also noted Claimant attended five sessions of

physical therapy and cancelled the other sessions, but he reported to treating doctor he continued

to attend sessions.  (Tr. 411).  Claimant failed to seek pain clinic referrals or to attend physical

therapy as advised by neurosurgeon.  (Tr. 412).  The consultant indicated that Claimant has no

established manipulative, visual, or communicative limitations.  (Tr. 413-14).  With respect to

postural limitations, the consultant found Claimant can occasionally climb, balance, kneel, and

crouch and imposed such limitations to prevent back pain.  (Tr. 413).  As a reasonable precaution

in ischemic heart disease, the consultant found with respect to environmental limitations, Claimant

should avoid concentrated exposure to extreme cold and heat and vibration.

(Tr. 414).  The consultant opined that '[c]essation of work does not correlate with medical

problems as the treating record shows.  IHD was[*sic*]  does not further limit RFC as his

cardiologist feels his chest pain is related to anxiety."  (Tr. 415).  The consultant noted that

Claimant's back pain complaints do not begin in the treating record until September 2003 and not

diagnosed until June 2004, and the x-ray studies do not support diagnosis of radiculopathy.  (Tr.

415).

　　　　On February 7, 2007, Dr. John Groll, a cardiologist,  noted how he suspected Claimant's

"chest pain is actually not coronary in origin."  (Tr. 581-82).  Dr. Groll noted that although

Claimant reports chest discomfort since stenting, "review of records demonstrate that the chest pain preceded the stenting, which is why the procedure was undertaken in January 2005.  Dr. Remo performed a stress test in Sullivan last Fall, which was entirely within normal range."  (Tr. 581).

In a follow-up visit on March 19, 2007, Dr. Groll noted that Claimant has mild coronary artery disease with a normal left ventricle ejection fraction.  (Tr. 509).  Dr. Groll diagnosed Claimant with a stable coronary artery disease with stable stents.  Dr. Groll opined that Claimant's purported symptoms not to be consistent with heart disease given his normal stress test in 2007 and the catheterization results.  Dr. Groll opined that Claimant's chest pain might by psychological.  (Tr. 509).

On April 16, 2007, Dr Remo referred Claimant to a psychiatrist for treatment.  (Tr. 477).

On February 26, 2008, Claimant returned to Dr. Remo's office for follow-up treatment of his diabetes and to have his Disability Attestation Form completed.  (Tr. 738).  Dr. Remo noted that his disability is on account of his low back pain.  Claimant reported constant low back pain on a 3/10 intensity level with medication but without medication, the intensity level is 9/10.  Dr. Remo noted that the pain to be across the lumbar areas making it difficult to extend his back. Claimant reported sometimes walking with a cane in a stooped position.  Dr. Remo started back strengthening exercises to improve Claimant's discomfort and continued his medications, MS Contin, MSIR, and aspirin.  (Tr. 738).

On February 26, 2008, Dr. Remo completed a physical residual functional capacity questionnaire at counsel's request.  (Tr. 534-42).  Dr. Remo listed chronic low back pain, CAD, stent replacement, and major depression as his diagnoses and opined his prognosis to be poor.

- 10 -

(Tr. 536). Dr. Remo noted Claimant to be incapable of even low stress jobs citing Claimant's inability to work as an emergency room nurse. (Tr. 538). With respect to functional limitations, Dr. Remo determined that Claimant can walk one half block and sit and/or stand for twenty minutes. (Tr. 539). Dr. Remo indicated that Claimant would need to shift positions at will from sitting, standing, and walking and would need to take unscheduled breaks every thirty minutes. (Tr. 539). With prolonged sitting, Claimant would have to elevate his legs, and in a sedentary job, Claimant would have to have his legs elevated 80% of the eight hour workday. (Tr. 540). Dr. Remo indicated that Claimant must use a cane. Dr. Remo noted that Claimant could frequently lift less than ten pounds and occasionally lift ten pounds. (Tr. 540). Dr. Remo noted that Claimant can never twist, stoop/bend, or crouch, and Claimant has no significant limitations with reaching, handling, or fingering. (Tr. 541). On average, Claimant would have to miss four days of work each month. (Tr. 542).

On March 25, 2008, Claimant reported continued back pain. (Tr. 737). Dr. Remo recommended weight loss inasmuch as weight reduction would be of significant improvement to his diabetes, hypertension, heart disease, and low back pain. (Tr. 737).

In a letter addressed "To whom it may concern:" written by Dr. Remo on March 28, 2008, the letter states:

> Over the last two years, Mr. Schupp has had progression in his medical problems, specifically lower back pain and anxiety/depression. His physical activities had progressively declined as well, limited by the above.
>
> His other medical problems include: DM2, CAD, HTN, Dyslipidemia and Peripheral Vascular disease with venous insufficiency which may all contribute to this.

- 11 -

(Tr. 531, 728).[3]

On May 23, 2008, Claimant reported somnolence and his pain being under better control. (Tr. 736).  Dr. Remo decided to switch Claimant's medications since he experience somnolence from MS Contin.  (Tr. 736).

In a Medical Source Statement dated June 3, 2008, Dr. Remo responded yes to the following question: "To a reasonable degree of medical certainty, have the limitations described in your statement of 2/26/2008 and May 2008 existed at the assessed level of severity since before September 30, 2006?"  (Tr. 727).

On July 28, 2009, Dr. Robert Poetz evaluated Claimant at the request of Claimant's counsel.  (Tr. 808-15).  Claimant reported having low back pain starting in 1994 and being unable to walk or drive long distances due to pain.  (Tr. 808).  Examination showed the cervical and thoracic spine to have a good range of motion without deformity or myospasm, and straight leg raising to be negative in a seated and supine position.  (Tr. 811).  Dr. Poetz diagnosed Claimant with multi level degenerative disc disease, coronary artery disease and mild myocardial infarction, diabetes, hypertension, and major depression.  (Tr. 811-12).  Dr. Poetz recommended range of motion exercises, anti-inflammatory medication.  (Tr. 812).  Dr. Poetz opined that Claimant should avoid heavy lifting and strenuous activity, prolonged sitting, standing, walking, twisting, or climbing, activities that require increased cardiac input, stressful situations, and extremes of heat and cold.  In the conclusion, Dr. Poetz opined that "based on the results of my evaluation as well as the patient's verbal history and review of the medical records presented to me that Mr. Schupp

---

[3]A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability.  House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

is unable to maintain gainful employment due to his multiple health conditions." (Tr. 812). In the
Medical Source Statement - Consultative Examination, Dr. Poetz indicated that in an eight hour
workday, Claimant can sit for four hours, stand for one hour, and walk for one hour. (Tr. 813).
Dr. Poetz noted that Claimant's impairments would cause the need to lie down or take a nap
during the workday and to take more than three breaks. (Tr. 814). With respect to the date of
onset, Dr. Poetz opined that it would be "difficult to assess actual date, however one would opine
his symptoms culminated to maximum severity in 2004." (Tr. 815).

IV.     **The ALJ's Decision**

        The ALJ noted that Claimant last met the insured status requirements of the Social
Security Act on September 30, 2006. (Tr. 16). The ALJ found that Claimant has not engaged in
substantial gainful activity during the period from his alleged date of September 30, 2006, through
his date of last insured of September 30, 2006. (Tr. 16). Through the date of last insured, the
ALJ found that Claimant has the severe impairments of degenerative disc disease, degenerative
joint disease, and coronary artery disease but that Claimant does not have an impairment or
combination of impairments that met or medically equaled one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-17). After careful consideration of the entire
record, the ALJ determined that Claimant has the residual functional capacity to perform the full
range of sedentary work. (Tr. 17) The ALJ determined Claimant is unable to perform any of his
past relevant work. (Tr. 22). The ALJ noted that Claimant is fifty-three years old and thus an
individual approaching advanced age, and he has at least a high school education and is able to
communicate in English. The ALJ found that Claimant has acquired work skills from past
relevant work. Considering Claimant's age, education, work experience, and residual functional

- 13 -

capacity, the ALJ found that Claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.  (Tr. 22).  The ALJ concluded that Claimant is not been under a disability at any time from September 30, 2006, the alleged onset date, through September 30, 2006, the date of last insured.  (Tr. 23).

**V.      Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's]

- 14 -

physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is

not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is

found to have a severe impairment the ALJ proceeds to step three in which he must determine

whether the impairment meets or is equal to one determined by the Commissioner to be

conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is

not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy.  In step five, the ALJ must consider the claimant's "age,

education, and past work experience."  Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

      Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274

F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008)).  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion."  Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.  Id.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

At the outset, the undersigned notes that Claimant has the burden of proving he was

disabled prior to the expiration of his insured status on September 30, 2006.  To be eligible for

disability benefits under Title II, Claimant must establish that he became disabled prior to the

expiration of his insured status on September 30, 2006.  See Davidson v. Astrue, 501 F.3d 987,

989 (8th Cir. 2007) ("Davidson's insured status expired on December 31, 2003, so like the

Commissioner, we consider her condition before that date."); Cox v. Barnhart, 471 F.3d 902, 907

(8th Cir. 2006) ("To be entitled to benefits Cox must prove she was disabled before her insurance

expired on December 13, 1995.").  When an individual is no longer insured for Title II purposes,

medical evidence of their condition will only be considered as of the date the individual was last

insured.  "A non-disabling condition which later develops into a disabling condition after the

expiration of a claimant's insured status cannot be the basis for an award of disability benefits

under Title II." Eggering v. Astrue, Cause No. 4:10cv821 TIA, 2011 WL 3904103 at *7 (E.D.

Mo. Sept. 6, 2011).  "Evidence from outside the insured period can be used in helping elucidate a

medical condition during the time for which benefits might be rewarded." Cox, 471 F.3d at 907.

"When an individual is no longer insured for Title II disability purposes, [the Court] will only

consider an individual's medical condition as of the date she was last insured." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997); 20 C.F.R. 404.130.  New evidence is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition. Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997).  Here, Claimant's insured status expired on September 30, 2006.  Therefore, the ALJ was not required to consider the medical evidence and opinions dated after that date unless it bears upon the severity of his condition before the expiration of his insured status.

Claimant's insured status expired on September 30, 2006. Therefore, the ALJ was not required to consider the medical evidence and opinions dated after that date. Eggering, 2011 WL 3904103 at *7.  In rejecting Dr. Poetz's evaluation, the ALJ noted that the Claimant's counsel procured the evaluation, and "Dr. Poetz provided a much less limited residual functional capacity as of July 28, 2009 than the claimant alleges existed nearly three years earlier.  The claimant had not been diagnosed with diabetes, cellulitis, and chronic fungal infections prior to his date last insured and did not begin to have significant depressive limitations until after that date."  (Tr. 22). The undersigned finds that the evaluation was completed over two and one half years after the expiration of Claimant's insured status, and Dr. Poetz did not include in his evaluation a retrospective assessment of Claimant's functional limitations.  Further, as noted by the ALJ, Claimant was not diagnosed with diabetes, cellulitis, and chronic fungal infections and had not started to have significant depressive symptoms prior to his date of last insured.  "A nondisabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II." Stanfield v. Chater, 970 F. Supp. 1440, 1456 (E.D. Mo. 1997) (citations omitted).  While evidence of a

claimant's condition subsequent to the expiration of his insured status may bear upon the severity of the claimant's condition before the expiration of his [] status," Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984), a claimant must nonetheless establish his disability existed prior to the expiration of his insured status.  As such, the medical opinions set forth in the evaluation do not establish Claimant became disabled prior to the expiration of his insured status.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating his residual functional capacity.   Next, the Claimant contends that the ALJ erred in relying on the testimony of the vocational expert that he acquired skills in patient care, medical matters, and record keeping.

Claimant contends that the ALJ erred in formulating his residual functional capacity.  In particular, Claimant argues that the ALJ's RFC is not supported by substantial evidence, because the ALJ erred by failing to make a function-by-function assessment of his RFC, specifically, findings as to his capacity for each of the exertional activities associated with sedentary work – lifting and carrying, pushing and pulling, sitting, standing, and walking.

In response quoting 20 C.F.R. § 404.1567(a), the Commissioner in his brief noted that the regulations define sedentary work as that which involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Further, the Commissioner noted that walking and standing are required occasionally.  The Commissioner asserts that by reference to the regulations, "the ALJ found that Plaintiff was able to occasionally lift up to 10 pounds, sit for a full workday, and walk or stand occasionally."

A claimant's RFC is what he can do despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  A claimant's RFC is the most he can do despite his physical and

mental limitations.  Depover v. Barnhart, 349 F.3d 563, 565 (8th Cir. 2003).  The RFC "'is a function-by-function assessment based on all the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations."  Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting S.S.R. 96-8p, 1996 WL 374183 at *3 (Soc. Sec. Admin. July 2, 1996)).  Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians, and others, and an individual's own description of his limitations.'"  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoted case omitted).  In determining whether an individual is capable of returning to his past relevant work, the ALJ must specifically set forth the individual's limitations and determine how those limitations affect his RFC.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (cited case omitted).

The ALJ is required to make "'explicit findings' regarding the physical and mental demands of [the claimant's] past work, and to compare those demands with [his or] her residual functional capacity to determine whether [he or] she could perform relevant duties."  Lowe, 226 F.3d at 972 (quotation omitted); see also Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999) ("'An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements.  The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity.'  Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991)").  Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir. 1995) (holding that conclusory determinations an individual can perform past work without specific findings as to the physical and mental demands of his past work and how those demands affect the individual's ability to perform that work, does not constitute substantial evidence that he is able to return to his past work).

- 20 -

The Court finds that the ALJ did not sufficiently provide the required residual functional assessment in this case.  In Pfitzner, the Eighth Circuit of Appeals remanded the claimant's case back to the ALJ because the ALJ "failed to make the required specific findings as to Pfitzner's residual functional capacity and past work demands."  Pfitzner, 169 F.3d at 569.  Similar to Pfitzner, the Court finds that this matter should be remanded because the ALJ failed to make a function-by-function assessment of Claimant's physical limitations.  The ALJ's RFC determination merely stated that Claimant has the RFC to perform the full range of sedentary work.  The ALJ did not make any specific findings regarding Claimant's limitations with lifting, carrying, pushing, pulling, sitting, standing, walking, or any other exertional requirement.  On remand, the ALJ shall provide a function-by-function assessment of Claimant's physical limitations and fully and fairly develop the record.

For the foregoing reasons, the ALJ's decision is not supported by substantial evidence on the record as a whole.  Inasmuch as there is not substantial evidence to support the ALJ's decision, this Court must reverse the decision.  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be reversed.

## Conclusion

Claimant might not be disabled within the meaning of the Act.  The ALJ's RFC is not supported by substantial evidence, because the ALJ erred by failing to make a function-by-function assessment of his RFC, specifically, findings as to his capacity for each of the exertional activities associated with sedentary work – lifting and carrying, pushing and pulling, sitting,

standing, and walking.  Accordingly, the case should be remanded for a further clarification and explanation of Claimant's RFC.  Therefore,

**IT IS HEREBY ORDERED**  that  the final decision of the Commissioner denying social security benefits be **REVERSED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** for further proceedings consistent with this Memorandum and Order pursuant to sentence four of § 405(g).  An appropriate judgment will accompany this Memorandum and Order.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this   12th   day of September, 2012.